## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JOHN DOE, | \| |
| | \| |
| | \|     Hon. Janet T. Neff |
| Plaintiff, | \| |
| | \|     Case No. 18-cv-1413 |
| v. | \| |
| | \| |
| MICHIGAN STATE UNIVERSITY, | \| |
| MICHIGAN STATE UNIVERSITY BOARD | \| |
| OF TRUSTEES; JOHN ENGLER, individually and as | \| |
|  agent for Michigan State University, KROLL | \| |
| ASSOCIATES, INC, as agent for | \| |
| Michigan State University, MARK EHLERS, | \| |
| individually   and as agent for Michigan State University, | \| |
| KENDRA WALDSMITH, individually and as agent | \| |
| for Michigan State University, ANDE DUROJAIYE, | \| |
| individually and as agent for Michigan State University, | \| |
| RICK SHAFER, individually and as agent for Michigan | \| |
| State University, DENISE MAYBANK, individually | \| |
| and as agent for Michigan State University, | \| |
| | \| |
| Defendants. | \| |

Nesenoff & Miltenberg LLP
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Cindy Singh, Esq.

Attorneys for Plaintiff
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
csingh@nmllplaw.com

Bogas & Koncius P.C.
Brian E. Koncius, Esq. (P69278)
Local Counsel for Plaintiff
31700 Telegraph Road, Suite 160
Bingham Farms, MI 48025
248-502-5000 (telephone)
248-502-5001 (fax)
bkoncius@kbogaslaw.com

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, John Doe[1], by and through his attorneys NESENOFF & MILTENBERG, LLP and BOGAS & KONCIUS P.C. and SOMMERS SCHWARTZ, P.C. and hereby files the following Amended Complaint consistent with Fed. R. Civ P. 15(a)(1)(B) to include class claims against the Defendants.

## THE NATURE OF THIS ACTION

1.      Denied equal protection under the law as well as the most fundamental guarantees of due process—without a hearing, without any opportunity to cross-examine his accuser— Plaintiff John Doe ("Plaintiff," "Doe," or "John Doe") was falsely declared guilty of sexual assault and suspended by Michigan State University ("Michigan State" or "University"). This Amended Complaint recognizes the common nature of Defendants' deprivation of MSU students' constitutional rights and adds a class action allegation for Count I (alleging denial of Due Process in violation of the Fourteenth Amendment to the U.S. Constitution), and Count V (alleging denial of Due Process and violation of Article 1, § 17 of the Michigan State Constitution) pursuant to Fed. R. Civ. P. 23(b)(2).

2.      As a result, Plaintiff, though innocent of any wrongdoing, has sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.  To redress this gross injustice, Plaintiff hereby sues Michigan State and the responsible University officials and agents of the University.

3.      The motivation behind Defendants' blind, unlawful rush to find Plaintiff guilty is plain.  As will be detailed below, beginning in September 2015, Defendants came under

---

[1] Plaintiff previously moved to proceed pseudonymously as "John Doe," which motion was granted on April 9, 2019.  ECF No. 30.

extraordinarily intense pressure to convict men accused by female students of sexual assault.  The sources of this intense pressure included:

    a.  a threat from the United States Department of Education, Office of Civil Rights ("OCR") to cut off federal funding to Michigan State due to claims that the university had failed to vigorously prosecute, convict and punish alleged sexual assailants;

    b.  a widely publicized report alleging extraordinarily high levels of unredressed sexual assaults against female undergraduates at Michigan State; and

    c.  scandal, and potential liability, faced by Michigan State and its officials for sexual assaults committed by its former employee Dr. Larry Nassar.

4.    After September 2015, determined to placate OCR, to avoid the potential loss of millions of dollars in federal funding, restore its reputation, and protect itself from future liability, Defendants launched a campaign to—in its own words—go "above and beyond" even OCR's demands, prosecuting women's sexual assault claims aggressively, demonstrating its willingness to believe women who claimed sexual assault, and to convict and punish alleged assailants.  Plaintiff was a casualty of this campaign.

5.    Throughout the investigation and adjudication of Jane Roe's[2] complaint, Defendants engaged in substantial errors in violation of federal law, state law, and the University's own policies. A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants relied upon a gender biased investigative report produced by investigators who acted as prosecutors building a case for the complainant and disregarding inconsistencies in Jane Roe's story;  (ii) Defendants evidenced a gender bias against John Doe as

---

[2] The complainant in Michigan State's Title IX investigation is referred to pseudonymously as Jane Roe.

the male accused of sexual misconduct throughout the investigative process; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (v) Defendants deprived John Doe of a hearing where he could have the opportunity to confront and question his accuser; (vi) Defendants employed the "single-investigator" procedure, in which the investigators served as prosecutor, investigator, judge and jury, adjudicating Doe's guilt without any checks and balances on sexual bias.

6.      With respect to Defendants' refusal to provide a live hearing or the opportunity for cross-examination, such refusal is blatantly unconstitutional, as recognized by Sixth Circuit for well over a decade.  *See Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) ("[C]ross-examination is not only beneficial, but essential to due process."); *see also Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *1 (6th Cir. Sept. 7, 2018) (reiterating and reaffirming *Flaim*).

7.      As a result of the University's erroneous and gender-biased decision in this matter, Plaintiff was suspended for a term of two years and must comply with a no contact order vis-à-vis Jane Roe.  Should he be allowed to return to Michigan State following his suspension, Plaintiff will be prohibited from (i) joining any fraternity or sorority and (ii) attending any fraternity or sorority event.

8.      Not only is Plaintiff's sanction based upon an erroneous outcome, it is unduly punitive.  In issuing this sanction, the University failed to give independent consideration to the factors for determining appropriate sanctions as set forth in the University's Policies and

Procedures. Rather, the University simply rubber-stamped the sanction that Roe indicated she wanted to have imposed on Plaintiff.

9.      Michigan State's imposed discipline has had, and will continue to have, long-term and severe consequences for Doe. He is severely depressed, socially withdrawn, and struggling with insomnia. In the Spring 2018 semester, due to the stress of this proceeding, his academics suffered, and he failed one class. Given the suspension, Plaintiff, a member of the class of 2020, will not be able to complete his undergraduate degree on time. Given the resulting notation on his transcript, Plaintiff's chances of admission to another comparable undergraduate program and to a graduate program of his choice are severely diminished.

10.      Plaintiff has filed a Notice of Intent to File Claim with the Michigan Court of Claims pursuant to MCL 600.6431. The Notice of Intent to File Claim was received by the Clerk's Office on December 19, 2018 at 1:45 p.m.

## THE PARTIES

11.      Plaintiff is a natural person domiciled in the State of Michigan. During the events described herein, Plaintiff was a sophomore undergraduate student at Michigan State, class of 2020. At all times relevant herein, Plaintiff resided in a dormitory on the Michigan State campus.

12.      Defendant Michigan State is a land grant university established by the State of Michigan and its main campus is located in East Lansing, Michigan. Michigan State is the beneficiary of state appropriations and is the recipient of state and federal grants.

13.      Defendant Michigan State University Board of Trustees ("Michigan State Board of Trustees") is an eight-member board responsible for making rules and regulations to govern

Michigan State.  The election of these Trustees is prescribed by Article XIII, Section 5 of the Michigan State Constitution and Michigan Election Law section 168.286.

14.     Defendant John Engler was the Interim President of Michigan State during all relevant times described in this complaint.  Mr. Engler is sued in his individual capacity and as an agent for Michigan State.  Upon information and belief, Mr. Engler is a resident of the State of Michigan.

15.     The Board of Trustees, and Mr. Engler as the Board's administrative hand during the period in question, are responsible for ensuring that all Michigan State employees are properly trained and supervised to perform their jobs.

16.     Defendant Ande Durojaiye was the Director of the Office of Institutional Equity ("OIE") and Michigan State's Deputy Title IX Coordinator at all times relevant to this complaint.  Dr. Durojaiye was responsible for ensuring that the University complied with all applicable antidiscrimination laws, including Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and is sued individually and in his capacity as an agent of Michigan State University. Upon information and belief, Durojaiye is a resident of the Commonwealth of Kentucky.

17.     Defendant Rick Shafer is Michigan State's Associate Director of Student Conduct and Conflict Resolution and is named herein individually and in his capacity as agent of Michigan State.  Upon information and belief, Shafer is a resident of the State of Michigan.

18.     Defendant Denise Maybank is the Vice President of Student Affairs and Services and is named herein individually and in her capacity as agent of Michigan State. Upon information and belief, Maybank is a resident of the State of Michigan.

6

19.     Defendant Kroll Associates, Inc. ("Kroll") is a global investigations and risk management and consulting firm, headquartered in New York, New York.  In February 2018, Michigan State retained Kroll Associates to assist the Office of Institutional Equity to investigate Roe's sexual assault allegations against Doe. Kroll Associates, Inc. is sued as an agent of Michigan State University.

20.     Defendant Mark Ehlers is an employee of Kroll, and in that capacity, he conducted the investigation of the Roe's allegations.  Defendant Ehlers is sued individually and in his capacity as an agent of Michigan State University.

21.     Defendant Kendra Waldsmith is an employee of Kroll, and in that capacity, she also conducted the investigation of the Roe's allegations.   Defendant Waldsmith is sued individually and in her capacity as an agent of Michigan State University.

## JURISDICTION AND VENUE

22.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution. This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Michigan State within the State of Michigan.

23.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district and because virtually all of the Defendants are located in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### BACKGROUND: THE "APRIL 2011 DEAR COLLEAGUE LETTER"
### OF THE DEPARTMENT OF EDUCATION'S OFFICE FOR CIVIL RIGHTS

24.     On April 4, 2011, the OCR of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "Dear Colleague Letter").  The Dear Colleague Letter provides a necessary set of background facts to this action.

25.     The Dear Colleague Letter advised that, to comply with Title IX, colleges and universities must have procedures to promptly investigate and resolve complaints of sexual misconduct.

26.     Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof – "more likely than not" – in cases involving sexual misconduct, including assault.  Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

27.     The Dear Colleague Letter stated that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

28.     The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

29.     The Dear Colleague Letter stated that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

30.     After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

31.     The Obama Administration, through the DOE and OCR, treated the Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

32.     In February 2014, Former DOE Assistant Secretary for Civil Rights, Catherine J. Lhamon ("Lhamon"), told college officials attending a conference at the University of Virginia that schools needed to make "radical" change.

33.     According to the *Chronicle of Higher Education*, college presidents said afterward that there were "crisp marching orders from Washington." *See* "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," *Chronicle of Higher Education*, February 11, 2014 (available at: https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703).

34.     In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the Dear Colleague Letter. She told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school."

35.     In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant

with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat," Lhamon warned.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding that "[i]f a school refuses to comply with Title IX in any respect, I will enforce."  Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step… It means that so far the process has been working."  Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," msnbc.com, July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

36.    Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

37.    To support making the Dear Colleague Letter binding, the OCR hired hundreds of investigators for Title IX enforcement.  The Federal Government is investigating approximately 250 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago as well as many top state universities including Michigan State.

38.    The Department of Education negotiated settlements with many schools, including Michigan State, which resolved two Title IX investigations on September 1, 2015.

39.    The investigations resolved in 2015 stemmed from Michigan State's failure to promptly act on two reports of sexual assault as well as Michigan State's failure to have proper procedures and policies in place to handle sexual assault reports.

40.     There are currently two pending OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018.

https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).  Both OCR investigations were pending during all periods relevant to this complaint.

41.     Colleges and universities, including Michigan State, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The Obama Administration issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds."  It further advised that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools.  If a voluntary resolution cannot be reached, the DOJ may initiate litigation against the institution.  In July 2016, Vice President Joseph Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.  "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

42.     To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

43.     The DOJ and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The *Chronicle of Higher Education* noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Robin Wilson, "*Presumed Guilty: College men accused of rape say the scales are tipped against them*," *Chronicle of Higher Education,* September 1, 2014, https://www.chronicle.com/article/Presumed-Guilty/148529. In the same article, the *Chronicle* noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id*. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

44.     On September 22, 2017, OCR rescinded the Dear Colleague Letter and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See*, *e.g.*, https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

45.     The interim OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying

either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. The interim guidance also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

46.     The interim OCR guidance, as well as the accompanying review of OCR's prior guidance documents, suggest that the Equity Grievance policies and procedures in place at all times relevant to this lawsuit – which were tailored in such a way as to comply with the Dear Colleague Letter under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

## THE CONTRACT BETWEEN PLAINTIFF AND MICHIGAN STATE

47.     Plaintiff, like all other students attending Michigan State, agreed to be bound by Michigan State's policies and procedures including its Relationship Violence and Sexual Misconduct Policy (the "RVSM Policy").

48.     The RVSM Policy is intended to define relationship violence, stalking, sexual misconduct, and describe the process for reporting violations of the policy, outline the process used to investigate and adjudicate alleged violations of the policy, and identify resources available to members of the Michigan State community who are involved in an incident of relationship violence, stalking, or sexual misconduct. *See* RVSM Policy § I.

49.     The RVSM Policy states that it applies to all members of the Michigan State community, including faculty, staff, and students regardless of gender, sexual orientation, or gender orientation and prohibits relationship violence, stalking, or sexual misconduct against

13

employees, students, or third parties.  A third party is defined as an individual who is not a member of the Michigan State community (faculty, staff, or student) and is intended to include visitors, guests, contractors, alumni, or students from other institutions.  *See* RVSM Policy § II.

50.     Michigan State employs a Title IX Coordinator to oversee its gender equity work to ensure compliance with Title IX, including its grievance procedures, education/prevention efforts, and training.  The Title IX Coordinator is charged with reviewing information about relationship violence, stalking, and sexual misconduct complaints to identify and address any patterns or systematic problems that arise during the review of such complaints.  *See* RVSM Policy § IV.

51.     Pursuant to the RVSM Policy, Michigan State has established the OIE to ensure Michigan State's compliance with federal and state laws and Michigan State policies and procedures regarding discrimination, harassment, relationship violence, stalking, and sexual misconduct.  *See* RVSM Policy § V.

52.     The Director of OIE is designated as the Deputy Title IX Coordinator for Investigations.  *See* RVSM Policy § V.

53.     The RVSM Policy defines a "Claimant" as a person who may have been subjected to prohibited conduct regardless of whether that person makes a report or seeks action under the Policy.  Claimants have the opportunity to review the preliminary investigative report and provide feedback and appeal the outcome of the OIE decision and appeal or grieve the sanction.  *See* RVSM Policy § VI.

54.     The RVSM Policy defines a "Respondent" as a person, registered student organization, or entity that has been accused of committing prohibited conduct.  Respondents have the opportunity to review the preliminary investigative report and provide feedback and

14

appeal the outcome of the OIE decision and appeal or grieve the sanction.  *See* RVSM Policy § VI.

55.     The RVSM Policy defines an "Investigator" as a professionally trained staff member of the OIE or a professionally trained outside expert who conducts the investigation under the supervision of the Title IX Coordinator and/or Director of OIE.  *See* RVSM Policy § VI. Under the RVSM Policy, an investigator "conducts an impartial, fair and unbiased investigation" into allegations.  *Id.*  The Investigator "review all of the information and applies the preponderance of the evidence standard to determine whether the conduct at issue occurred, and, if so, whether the conduct constitutes a violation of the RVSM Policy." *Id.*

56.     The RVSM Policy defines "Sexual Violence" as including rape, sexual assault, and sexual contact.  *See* RVSM Policy § X.C.

57.     The RVSM Policy defines "Sexual Assault" as a subset of Sexual Violence and includes "sexually penetrating, attempting to sexually penetrate, or having sexual contact with another individual by force or threat of force; without consent; or where the victim is incapacitated."  *See* RVSM Policy § X.C.

58.     The RVSM Policy defines rape as a form of sexual assault that includes: (i) "non-consensual penetration, no matter how slight of the victim's genital opening…with any body part…;" or (ii) "non-consensual use of the sex organ of the victim to penetrate no matter how slight, the genital opening… of another person." RVSM Policy § X.C.

59.     The RVSM Policy defines "Incapacitation" as a state where an individual cannot make an informed and rational decision to consent to engage in sexual activity because the individual lacks conscious knowledge of the nature of the act.  *See* RVSM Policy § X.F.  Under the RVSM Policy, incapacitation can only be found when the respondent "knew or should have

15

known that the claimant was incapacitated when viewed from the position of a sober, reasonable person." RVSM Policy § X.F.

60. The RVSM Policy calls for the OIE to investigate claims of sexual assault using trained professionals to conduct an investigation under the oversight of the Deputy Title IX Coordinator for Investigations. *See* RVSM Policy XIII.M.

61. The RVSM Policy states that "[t]he University has an obligation to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct, stalking or relationship violence regardless of whether the alleged victim is the individual who reports the relationship violence, stalking, or sexual misconduct." *See* RVSM Policy XIII.M.1.

62. Investigations begin with a determination of whether Michigan State has jurisdiction over the matter. If jurisdiction is established, the claimant and respondent are notified of the initiation of the investigation, the potential policy violations at issue, the right to participate in the investigation, the timeframe for responding, and that the investigation may proceed without the participation of either party. *See* RVSM Policy § XIII.M.1.a.

63. The RVSM Policy also provides that the parties to the investigation are primarily responsible for providing information and evidence, but the OIE, to the extent possible will gather evidence relevant to the investigation that may be available within the University context or by contacting outside agencies, including medical treatment providers. *See* RVSM Policy § XIII.M.1.b.

64. Crucially, the RVSM Policy prohibits the parties from cross-examining each other during the investigation or adjudication process. They are instead required to submit questions in writing to the OIE to be asked of the other party. Questions can be submitted at any time

16

during the investigation process up to the deadline for the review of the preliminary investigation report.  *See* RVSM Policy § XIII.M.1.c.  But the RVSM does not guarantee that any given questions submitted by the accused will in fact be asked.  *Id*.

65.     At the conclusion of the fact-finding portion of the investigation process, both parties are supposed to be provided with an opportunity to review the preliminary investigation report and provide feedback to the information gathered, as well as ask any questions, before a final report is issued.  Michigan State utilizes a preponderance of the evidence standard during the investigation process, as well as in all related proceedings, including disciplinary hearings.  A respondent is presumed not to have violated the RVSM Policy unless a preponderance of the evidence establishes a policy violation.  *See* RVSM Policy § XII.M.1.d.

66.     These procedures, adopted by Michigan State under pressure from OCR and the "Dear Colleague Letter," contrast sharply with procedures employed by the university for other disciplinary violations such as academic integrity violations (e.g., cheating or plagiarism), which guarantee to accused students live hearings, cross-examination, adjudication by multi-member hearing panels, and in some contexts a clear-and-convincing standard of proof.

67.     Both the claimant and the respondent will be notified concurrently, in writing of the final outcome of the investigation, the rationale for the outcome, and the process to challenge the investigation findings.  *See* RVSM Policy XIII.1.M.d.

68.     Pursuant to the RVSM Policy, if the investigation results in a determination that relationship violence, stalking, or sexual misconduct occurred, the matter is referred to the Student Conduct and Conflict Resolution Office ("SCCR") so that the Sanction Panel can determine the appropriate sanction.  *See* RVSM Policy XIII.1.M.d. The Sanction Panel is comprised of one student, one faculty member, and one staff member.  *See* RVSM Policy VI.

69.     The RVSM Policy contemplates that Michigan State will complete its investigation within sixty calendar days, although the time frame can be extended for good cause.  To that end, the OIE Investigator is supposed to contact the claimant within five calendar days of receiving the report/complaint and contact the respondent within five calendar days of meeting with the claimant.  The OIE's preliminary report is supposed to be provided to the parties within 25 calendar days of completing all relevant interviews and gathering relevant evidence.  The final Report is supposed to be issued within 25 calendar days after receiving feedback from the parties or completing any additional investigation.  *See* RVSM Policy XIII.M.d.5.

70.     The RVSM Policy provides that in instances where no violation is found, the parties shall have ten calendar days from the date of the OIE decision to file an appeal.  In the event a violation is found, the Sanction Panel is supposed to issue a written decision regarding an appropriate sanction within seven calendar days after the panel meets.  The claimant and respondent have ten calendar days from the date of the sanction decision to appeal either the OIE decision or the sanction imposed.  *See* RVSM Policy XIII.M.d.6.

71.     In cases where the OIE investigation finds that sexual misconduct, stalking, or relationship violence occurred, Michigan State will determine the appropriate, enforceable sanction.  The sanction will be reasonably calculated to stop the harassment and prevent its recurrence.  *See* RVSM Policy XIII.M.d.10.

72.     An appeal must be based on one or more of the following grounds: (i) "The OIE finding was arbitrary and capricious.  A finding is arbitrary and capricious when the application of the [RVSM] policy has no reasonable basis in fact;" (ii) "The OIE findings resulted from procedural error (including bias or impartiality) materially affected the outcome;" and (iii) "The

sanction is clearly inappropriate or is not commensurate with the seriousness of the offense."
RVSM Policy Appendix I.

73.     Appeals involving suspension of a student will be determined by the Vice
President for Student Affairs and Services. RVSM Policy Appendix I.


### PLAINTIFF IS WRONGLY ACCUSED AND ULTIMATELY FOUND RESPONSIBLE FOR A SEXUAL ASSAULT THAT HE DID NOT COMMIT

#### A.  Background

74.     Plaintiff matriculated at Michigan State in the fall of 2016 and was a sophomore
at the time of the alleged sexual assault.  In high school, Plaintiff was a member of the football
team and devoted himself to community service in his spare time.  Since Plaintiff's sibling has a
cognitive disability, supporting the disabled is a cause that is especially close to his heart.

75.     At Michigan State, Plaintiff displayed the same compassion and dedication to
service that had marked his high school career.  He was also an active and upstanding member of
a fraternity, where he was well-regarded by his peers.

76.     Prior to the alleged assault in February 2018, Plaintiff had never been involved in
any disciplinary proceeding at Michigan State or elsewhere.

77.     At the time of the alleged incident, Jane Roe was a freshman at Michigan State.

78.     John Doe and Jane Roe met in December 2017, when Roe introduced herself to
him.  Doe and Roe had mutual friends at Doe's fraternity.

79.     After their first meeting, Doe and Roe became friends.  Doe began to develop
romantic feelings for Roe.  In January 2018, he asked her to attend the fraternity's "date party."
She agreed, and Doe believed that they each had a good time at that party.  Since Roe was a

special education major, Doe and Roe bonded over the fact that Doe's sibling has a cognitive disability.

80.     On the bus ride back from the "date party," Doe attempted to kiss Roe, but she rejected his advance.  Given Roe's rejection of Doe's advance, Doe believed that the two were just friends.

81.     Following the "date party," Doe and Roe continued to talk to each other as friends.  One night Roe became very intoxicated at a party and reached out to Doe to ask him to help her get home safely.  Doe and a friend picked Roe up and drove her to her dormitory.  Roe later thanked Doe for helping her.  The next time that Doe and Roe saw each other was the night of the alleged incident.

**B. The "Incident" on February 23-24, 2018**

82.     Doe invited Roe to his fraternity's "Beer Olympics" event, occurring from 8:00 p.m. to 10:00 p.m. on February 23, 2018.  Roe could not make the actual event because of another social engagement, but she arrived at the fraternity house at 11:00 p.m.

83.     It is undisputed that Roe was sober when she arrived and at all points during the alleged events.  By contrast, Doe had consumed several beers during the "Beer Olympics" event and subsequently drank "whiskey and coke."

84.     When Roe arrived, she and Doe began talking.  Roe asked Doe where the fraternity house's lounge was located.  Doe was surprised by this question as Roe had friends at the fraternity house and had been to the house many times.

85.     Doe nonetheless agreed to take Roe to the fraternity's lounge.  When they entered the lounge, Roe kissed Doe.

20

86.     Doe was surprised by Roe's kiss, because she had rejected him at the "date party" in January 2018, but he thought that Roe had had a change of heart.

87.     Roe and Doe kissed each other for about twenty seconds before someone opened the door to the lounge and interrupted them.

88.     Roe and Doe then stopped kissing and went into the hallway, where they talked to Doe's friend M.D. for approximately 45 minutes.

89.     Following this conversation with M.D., Roe told Doe that she had left something in her friend L.B.'s bedroom.  L.B. was a fraternity member who lived in the fraternity house. Roe asked Doe to accompany her to L.B.'s bedroom.

90.     Once Roe and Doe arrived in L.B.'s bedroom, Roe again kissed Doe.

91.     While in L.B.'s room, Roe told Doe that she did not want to have sex.

92.      Roe and Doe kissed each other for about another twenty minutes in L.B.'s room. They did not remove their clothing but mutually used their hands and fingers to pleasure each other.

93.     During this encounter, Doe told Roe that he felt uncomfortable engaging in these activities with her in another person's bedroom.  Doe asked Roe if he would like to go to his dorm room.  Roe agreed.

94.     Roe and Doe held hands on the walk back to Doe's dorm room.

95.     During the walk to his dorm room, and throughout all the events in question, Doe was behaving cautiously with Roe.  He was unsure of her motives, given that she previously rejected him at the "date party" in January.

96.     When Doe and Roe arrived at his dorm room, the two sat on his futon and began making out.

97.     Doe did not initiate any sexual activity.  He only reciprocated what Roe initiated. Roe removed Doe's shirt, and Doe, in response, removed Roe's shirt.  The two mutually removed each other's clothing until each was wearing only underwear.

98.     While the two were on the futon, Doe was positioned on top of Roe.  The parties were mutually using their hands to pleasure each other.  Doe asked Roe if she would like to move to his lofted bed, where it would be more comfortable.  Roe agreed.

99.     Once in Doe's bed, Doe and Roe continued to mutually kiss and touch each other.

100.    At this point, both were wearing only underwear. Roe was wearing a "thong." Roe positioned herself on top of Doe and began to simulate sexual intercourse with him.

101.    Roe then removed Doe's underwear and began to perform oral sex on him.  Doe had not asked Roe to perform oral sex, nor did Roe verbally ask Doe for consent to perform oral sex.

102.    Roe stopped performing oral sex after approximately one minute, and then again positioned herself on top of Doe with her genitals on top of Doe's genitals. Roe again did not verbally seek Doe's consent before performing these actions.

103.    Once on top of Doe, Roe and Doe again engaged in simulated sexual intercourse. Roe was still wearing her thong.

104.    As Roe and Doe gyrated on each other, simulating sexual intercourse, Roe's thong moved to the side.

105.    As they gyrated, Doe could feel that his penis was approaching Roe's vagina.

106.    Due to their mutual gyrations, Doe's penis briefly penetrated Roe's vagina by an inch or less.

107.    He asked Roe "if everything was ok" and Roe responded "yes."

22

108.    Roe remained on top on Doe, and the two continued to gyrate on one another, simulating sexual intercourse.

109.    For a second time, Doe could feel that his penis was approaching Roe's vagina. Due to their mutual gyrations, Doe's penis briefly penetrated Roe's vagina again by an inch or less.

110.    He asked Roe again "if everything was ok" and Roe again responded "yes."

111.    Roe remained on top of Doe, and Doe put his arms around her to be intimate.  In this position, the two continued to gyrate on each other, simulating sexual intercourse.

112.    Due to their mutual gyrations, Doe's penis briefly penetrated Roe's vagina for a third time by an inch or less.

113.    Afterwards, Doe noticed that Roe appeared uncomfortable and was shivering. Doe asked Roe if she was "ok."  Roe did not respond, and Doe immediately stopped all sexual activity.

114.    Roe got up to leave.  Doe, confused and hurt, tried to hug Roe and figure out what was wrong.

115.    Roe said she needed to go home, and Doe offered to order her a car through Uber. Roe declined his offer and left.

**C.  The Period Following the Alleged Incident**

116.    Once Roe left, Doe remained confused and hurt by the interaction.  He believed that Roe regretted "hooking up" with him and felt as though she had made a mistake.  Doe then fell asleep.

117.    Roe meanwhile went to her friend B.U.'s dorm room where she spent the night.

118.   At around 3:00 a.m., Doe saw that he had received a text message from A.C., a mutual friend of both Roe and Doe.  A.C. had been told that Doe forced himself on Roe.

119.   Shocked and confused, Doe immediately went to see E.D. and A.L., roommates who lived next door to Doe.  He recounted the events of the night to E.D and A.L. contemporaneously.  The version of events that Roe told Witness B.U. and that Witness B.U. told to Witness A.C. did not comport with what actually happened.

120.   On February 24th at noon, Roe and Doe exchanged text messages with each other. Doe maintained that it was never his intent to go against Roe's wishes and explicitly stated: "that why repeatedly I kept asking if everything was okay."

121.   During this text message exchange, Doe apologized to Roe, but his apology was not a concession of wrongdoing.  He had feelings for Roe and was genuinely confused as to why she was upset.  His first reaction, therefore, was to apologize to her.

122.   On February 24th, Roe had a rape kit taken at a local hospital.

123.   Approximately three weeks after the alleged sexual assault, Roe attended a St. Patrick's Day party held by some of Doe's fraternity brothers, where she was described as drinking, smoking an e-cigarette, and "having a good time."  Doe did not attend the St. Patrick's Day party.  By the time of this party, he had been suspended from his fraternity due to these false allegations.

**D.  The Flawed and Gender Biased Investigation**

124.   On February 28, 2018, Roe filed a complaint with OIE.  Roe alleged that Doe "had sex with her without her consent on the night of February 23, 2018."

125.   Michigan State retained Kroll to investigate the Roe's allegations.  Mark Ehlers and Kendra Waldsmith, employees of Kroll, conducted the investigation on behalf of OIE.

126.    The investigation was tainted from the outset by investigator bias.  Defendant Ehlers has a background as a sex crimes prosecutor.  On information and belief, he approached the investigation from a prosecutorial stance, rather than that of a neutral fact-finder.

127.    On March 14, 2018, Mr. Ehlers sent Doe correspondence via email notifying Doe that Michigan State intended to formally investigate him for "alleged violation(s) of the University's RVSM Policy."

128.    Mr. Ehlers' March 14, 2018 correspondence recited the following concerning the allegations against Doe:

> "[Roe] alleges that you engaged in non-consensual activity of a sexual nature in violation Title X.C of the University's RVSM Policy, on or about the early morning hours of February 24, 2018 inside your student dormitory room at Emmons Hall in East Lansing Michigan."

129.    Mr. Ehlers' March 14, 2018 correspondence provided Doe only vague and inadequate notice of the charges and allegations against him.

130.    Michigan State knew as of February 28, 2018, that Roe was accusing Doe of non-consensual sexual intercourse, i.e. rape, but the University did not relay this in the March 14, 2018 letter.  Instead, Mr. Ehlers noted that Doe was being investigated for "non-consensual activity of a sexual nature."

131.    Likewise, the March 14, 2018 correspondence only noted that Doe was being investigated for a violation of Title X.C of the RVSM.  Title X.C encompasses sexual assault, rape, and sexual contact, each of which is separately defined under the RVSM.  Without detailing the allegations against Doe, Michigan State also left him guessing as to the potential violations they were investigating.

132.    Despite the University's obligation to conduct an impartial investigation (see RVSM Policy XIII.M.1), the vague notice provided to Doe indicates that the investigation was tainted from the outset by gender bias and a presumption of Doe's guilt.

133.    The March 14, 2018 letter then asked that Doe set up a meeting with Mr. Ehlers and further stated that this meeting:

> "…is your opportunity to be heard.  During the meeting you will have the opportunity to provide a statement, submit evidence, and identify potential witnesses."

134.    Given that Michigan State provided vague and inadequate notice of the charges and underlying allegations against him, Doe was at a disadvantage in preparing for his meeting with the investigators.

135.    Crucially, under the RVSM, that meeting constituted Doe's only opportunity to be heard.  At no point was Doe offered a live hearing or even an opportunity for live cross-examination of Roe or her witnesses.

136.    To conduct its investigation, Michigan State interviewed Roe and Doe.

137.    The investigators also interviewed the following witnesses on behalf of Roe: 1) B.U.; 2) R.J; 3) A.R; 4) R.H; and 5) E.P.  None of Roe's witnesses were eyewitnesses to the alleged assault.

138.    The investigators additionally interviewed the following witnesses on behalf of Doe: 1) M.D.; 2) E.D.; 3) A.L.; and 4) J.F.  None of Doe's witnesses were eyewitnesses to the alleged assault.

139.    The investigators finally interviewed A.C., who had spoken to both Roe and Doe about the alleged assault.  A.C. was not an eyewitness to the alleged assault.

140.    With no eyewitnesses, the resolution of the investigation turned solely upon a credibility contest between Roe and Doe.

141.    The investigators improperly concluded that Roe's "account of her non-consent to sexual intercourse is credible."

142.    Doe lost the credibility contest due to gender bias on the part of the investigator and intense pressure at Michigan State to convict the males accused of sexual assault.

143.    The investigators utterly ignored the implausibility and numerous inconsistencies in Roe's narrative.

144.    Significantly, in her interview with the investigators, Roe stated that:

"…she was on top of him [Doe].  At this point, Respondent [Doe] was positioned with both arms wrapped around Claimant's [Roe's] back holding her down. Claimant [Roe] stated that Respondent [Doe] was 'pretty strong' and that he was holding her 'pretty tight' so that she was 'smashed into him.'

"Claimant [Roe] still had her underwear on at this point, but could again feel the Respondent's [Doe's] penis on her. Respondent [Doe] tried to remove Claimant's [Roe's] underwear but he could not due to the way the two were positioned. Respondent [Doe] then moved Claimant's [Roe's] underwear to the side, at which point Claimant [Roe] told Respondent [Doe] that she did not want to have sex. Respondent [Doe] moved her underwear to the side again, and this time penetrated her."

[emphasis added] .

145.    Roe's narrative, here, is not only internally inconsistent, but also implausible. Roe begins by noting that Doe had both of his arms wrapped around her, so tightly that she was "'smashed'" into him.  She then notes that Doe attempted to remove her underwear but could not do so because of "the way the two were positioned." This is consistent with Roe's earlier statement that she was being held so tightly as to be "'smashed'" into him.

146.    However, Roe then states that Doe moved her underwear to the side twice and then penetrated her.  Her allegation that Doe moved her underwear to the side twice is inconsistent with her claim that Doe had both arms wrapped tightly around her.  Likewise, this allegation is inconsistent with her claim that she was "'smashed'" into him.

27

147.    Roe's claim is a physical impossibility. According to Roe, both of Doe's hands were wrapped tightly around her. Therefore, Doe could not attempt to remove and/or move Roe's underwear.

148.    Additionally, while Roe delivered this narrative to the investigators at her interview, she sent a text message to her friend, witness A.R., with a different version of events on February 24, 2018, i.e. the afternoon following the alleged attack:

> "…we made out some more and during that his [Doe's] underwear was off, and he had his dick [penis] right by my underwear and started trying to take it off but I didn't want it off and I put my hand down there and he moved my underwear to the side and put the head in not all the way but about halfway…"

[emphasis added].

149.    Even though Roe told the investigators that Doe had both of his arms wrapped around her, so tightly that she was "'smashed'" into him, and so tightly that he could not remove her underwear, when he initially attempted to do so, in the narrative that she shared with Witness A.R., Roe omitted any mention of being "'smashed'" into Roe and no mention of Doe's hands allegedly being wrapped tightly around her.  In the version of events told to A.R., Roe's hand was free to be placed over her genitals.

150.    In her comments to the draft investigative report, Roe gave yet another report: "[Doe] held me on top of him tight and physically moved my underwear to the side and put his hand on his penis and inserted it into me."

151.    This account is again inconsistent with the two accounts discussed above. Additionally, in this version, Doe would have to have four hands, a physical impossibility, in order to do what he is accused of.  He would have to have two hands to hold Roe "on top of him tight," an additional hand to move her underwear, and another hand to insert his penis into her.

152.    Notably, the investigators make no mention of these glaring inconsistencies or physical impossibilities in their investigative report.  The investigators likewise did not appropriately consider this inconsistency in evaluating Roe's credibility.

153.    The investigators failed to adequately investigate discrepancies between narratives of Roe and Doe.

154.    Such discrepancies include but are not limited to a disagreement on the number of times that penetration occurred.  In his interview with investigators, Doe indicated that slight penetration occurred three times.  Doe's attorney advisor also reiterated that there were three instances of slight penetration in his comments to the draft investigative record.  Roe meanwhile indicated that there was only one instance of penetration.  No follow up interviews were scheduled with Roe to further discuss this discrepancy.  In their findings and analysis, OIE blindly accepted Roe's assertion that penetration only occurs once.

155.    The investigators likewise failed to conduct thorough independent credibility analyses of Roe's witnesses.  The investigators did not explicitly analyze whether any of Roe's witnesses had a motive to lie on Roe's behalf.

156.    By failing to conduct this credibility analysis, the investigators blindly relied upon the testimony of the female accuser's witnesses in corroborating Roe's account of what happened.

157.    Indeed, the investigators' findings that "[e]ach of Claimant's [Roe's] witnesses independently corroborated Claimant's [Roe's] account of what happened" is undermined by Roe's text messages with A.R., discussed above.

158.    As a non-eyewitness, it is impossible for Roe's witnesses to have "corroborated" what happened on the night in question. All these witnesses cold have done is repeat the story

Roe chose to tell them.  More importantly, as indicated above, Roe provided different versions of alleged events to A.R. and to the investigators.

159.    The reliability of Roe's witnesses is also questionable, at best.   Witness R.H. specifically stated at her interview that she "does not know a great deal about the incident that occurred on the night of February 23, 2018 because she 'did not want to pry.'"

160.    In spite of R.H.'s admission that she did not know a "great deal" about the alleged event, the investigators specifically noted in their findings and analysis that in Roe's account to her witnesses include R.H., Roe gave a "consistent account of what happened."

161.    The investigator failed to adequately investigate discrepancies in the accounts of Roe's behavior following the incident.

162.    For example, Roe' witnesses, B.U. and R. J. described Roe as "not quite the same as before" and "still not the same" following the alleged incident. Roe's witness, A.R., described Roe as "fragile" following the alleged assault.

163.     However, witnesses submitted by Roe, i.e. B.U. and R.J., and Doe, i.e. M.D. and E.D., confirmed that shortly after the alleged attack, Roe attended a St. Patrick's Day Party held by the fraternity.  E.D. noted that at the party, he observed Roe "drinking alcohol and smoking some type of e-cigarette while appearing to be 'partying and having a good time."

164.    Doe submitted the names of five additional witnesses who could discuss their observations of Roe at the St. Patrick's Day Party.  However, the investigators chose not to contact these witnesses noting: "Kroll did not contact these witnesses, as that fact [of Roe's attendance] is not in dispute and Claimant's [Roe's] attendance at the party was confirmed by several other witnesses that were contacted."

165.    That Roe attended the St. Patrick's Day Party was not the beginning and end of the inquiry.  The testimony gathered by the investigators revealed contradictory accounts of Roe's behavior following the alleged assault.  It was error, and an indication of bias, that the investigators chose not to interview the remaining suggested witnesses to find out more about how Roe behaved at this party.  Discrepancies in Roe's behavior would not only have impacted the investigator's analysis of her own credibility but also the credibility analysis of her witnesses.

166.    Additionally, rather than being impartial, the investigators acted more like prosecutors, building a case against Doe.

167.    Roe voluntarily went to the local medical center to have a rape kit taken.  The medical documents noted that "…in an area of the body labeled "vestibule/periurethral/clitoris/clitoral hood, Claimant [Roe] had an abrasion and area tender to palpitation."

168.    On information and belief, the records did not indicate trauma to Roe's vagina.

169.     In an effort to justify their erroneous finding of responsibility for non-consensual sexual intercourse, however, the investigators recast the contents of the medical records.

170.    The investigators stated: "Claimant's [Roe's] medical records, which OIE reviewed, noted an abrasion and an area 'tender to palpitation' in Claimant's vaginal area." [emphasis added]. The investigators concluded that such evidence corroborated Roe's "non-consent to sexual intercourse."

171.    Since Doe was specifically being investigated for alleged non-consensual penetration, it was important to precisely recite the contents of Roe's medical records.  A vague finding of an abrasion and tenderness in Roe's "vaginal area" lends credence to the investigators' preferred finding of responsibility.

31

172.    Additionally, the investigative record is silent as to whether the investigators interviewed the nurse that conducted Roe's examination.

173.    Finally, and more importantly, the fact that Roe may have had "an abrasion and area 'tender to palpitation'" "in an area of the body labeled 'vestibule/periurethral/clitoris/clitoral hood'" in fact **corroborates** Doe's account of the incident and certainly does not corroborate Roe's account of alleged non-consent to sexual intercourse.

174.    Such an abrasion and area of tenderness is consistent with any of the other, admittedly, consensual sexual activities that Doe and Roe engaged in on the night in question, including but not limited stimulation of Roe's clitoris by Doe's hand and fingers.   In her interview, consistent with Doe's account, Roe admits to engaging in consensual sexual activity which included Doe "fingering her."

175.    In their quest to find the accused male responsible of non-consensual sexual activity, the investigators chose to recast the contents of the medical records in vague terms to support their erroneous findings.

**E.  Erroneous Finding of Responsibility and John Doe's Sanction**

176.    Despite the University's Policy that investigations should be completed within 60 calendar days (RVSM XIII.M.5), Doe's final investigative report was not issued until May 23, 2018.

177.    Based on the foregoing, OIE erroneously concluded that Doe had violated the RVSM by engaging in non-consensual sexual intercourse with Roe, i.e. rape.

178.    Pursuant to the RVSM, an ADP/RVSMP Sanction Panel was convened to determine an appropriate sanction.  Roe submitted a victim impact statement and Doe submitted a sanction mitigation statement.

179.    In her victim impact statement, Roe noted that the following sanction would be appropriate: "'suspension for two years or longer' and 'prohibiting Respondent [Doe] from being able to partake in Greek life, clubs, and any type of club affiliated with MSU [Michigan State].'" She also expressed fear that she would "run into" Doe.

180.    In his mitigation statement, Doe noted the following, in consideration of the factors considered by Michigan State in determining an appropriate sanction: 1) he had no prior record of misconduct; 2) that there was no risk of recurrence, no ongoing threat, and that he too was severely impacted by the (false) allegations; and 3) that the investigators found that he had not "acted with malicious intent" and may have acted in the "passion of the moment."  Doe indicated that the investigators themselves had noted that the case was a "close call."

181.    Notably, Michigan State did not issue an interim no contact order in this matter.

182.    In issuing their sanction, in an effort to show that Michigan State was "tough" on offenders, the RVSMP/ADP Panel essentially rubber-stamped Roe's desired punishment.

183.    Doe was suspended for a term of two years and must comply with a no contact order vis-à-vis Roe.  Should he be allowed to return to Michigan State following his suspension, Doe will be prohibited from (i) joining any fraternity or sorority and (ii) attending any fraternity or sorority event.

**F.  John Doe's Appeal**

184.    On June 30, 2018, Doe timely filed an appeal with the Vice President for Student Affairs and Services, Dr. Denise B. Maybank, asserting that the findings of OIE were procedurally defective and arbitrary and capricious.

185.    He also appealed his sanction as being inappropriate and not commensurate with OIE's findings.

186.    On July 31, 2018, Dr. Maybank denied Doe's appeal. Pursuant to the RVSM Policy, an appeal must be decided within 14 days, unless notice is given to the parties.  Doe was not given any notice concerning an extension of the deadline to decide his appeal.

**G.  Harm Suffered by John Doe**

187.    Due to these baseless allegations, Doe was formally suspended from his fraternity.

188.    He has been labelled a "rapist," which has and will continue to harm his reputation going forward.

189.    Roe sent the final investigative report to the Board of Doe's local fraternity, further damaging Doe's reputation and causing emotional harm.

190.    Due to these baseless charges and the gender-biased investigation, Doe's academics have suffered to the point where he failed  a course in Spring, 2018.

191.    His suspension has foreclosed the opportunity to graduate with his matriculated class, i.e. the class of 2020, and this delay will result in economic harm.

192.    Doe's suspension has created difficulties for Doe to gain admission to another school to complete his undergraduate degree.  He has not been admitted to any other university and, and is instead attending a community college.  The caliber of education that he is currently receiving will also result in economic harm.

193.    His suspension and the resulting notation on his transcript also severely limits his ability to seek employment in numerous fields including but not limited to law enforcement and the ability to pursue a graduate program in the field of his choice. The suspension and transcript notation will undoubtedly result in harm to his future earning potential.

194.    Doe is depressed and socially isolated.   Fraternity brothers will no longer speak to him over false allegations. Individuals have blocked and/or unfollowed him on social media.

**H.  Climate at Michigan State Concerning Mishandling of Sexual Assault**

195.    Going back to at least 2014, Michigan State had come under pressure from the federal government for mishandling of sexual assault cases.

196.    In 2014, the Department of Education identified Michigan State in a list of 55 institutions facing investigation for possible violations of federal law for mishandling sexual violence and sexual harassment complaints. https://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations (last accessed on September 26, 2018).

197.    Subsequently, Michigan State received bad publicity over its handling of sexual assault cases.  For example, on September 1, 2015, the Detroit Free Press published an article concerning the University's mishandling of sexual assault cases, "Feds: MSU Mishandled Sexual Assault   Cases."   https://www.freep.com/story/news/local/michigan/2015/09/01/feds-msu-mishandled-sexual-assault-reports/71525852/ (last accessed on September 26, 2018).

198.    That article not only publicized the University's settlement with OCR to remedy improper procedures and policies for the handling of sexual assault cases but highlighted the University's efforts to remedy the situation.  The article noted that then President Lou Anna Simon had "been working for several years to improve how they handle sexual assault on campus." *Id.* at 1.

199.    The already-heated campus climate concerning sexual assault reached its boiling point in Spring, 2018, when Doe was being investigated for rape.

200.     As previously discussed, during the Winter and Spring of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018.  https://projects.propublica.org/graphics/civil-rights-violations#840  (last accessed on September 24, 2018).

201.     Likewise, in the Spring of 2018, the University garnered a great deal of bad publicity concerning the sexual assaults committed by its former employee Dr. Larry Nassar.  The New York Times reported: "the university has acknowledged some wrongdoing: It agreed to a $500 million settlement with 332 women and girls who were abused by Dr. Nassar, who for about 20 years abused athletes in his care."   https://www.nytimes.com/2018/05/30/sports/lou-anna-simon.html

202.     Upon information and belief, it was in part because of the pressure being exerted by OCR and because of the bad publicity surrounding the University, that the University sided with Roe over Doe in what amounted to a simple he said she said credibility contest.

203.     Plainly, the University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus.

204.     Upon information and belief, Defendant Michigan State has repeatedly conducted gender-biased investigations, conducted unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct.

## CLASS ALLEGATIONS

205.     Plaintiff Doe brings this lawsuit individually, and relative to Count I (alleging denial of Due Process in violation of the Fourteenth Amendment to the U.S. Constitution), and Count V (alleging denial of Due Process and Plaintiff's rights under Article 1, § 17 of the

Michigan State Constitution), as representative on behalf of a class pursuant to Federal Rule of Civil Procedure 23(b)(2).

206.    At this time, the proposed Class is:

> All MSU students and/or former students, including prospective and future students, subjected to a disciplinary sanction, suspension, or expulsion pursuant to a finding of responsibility under the RVSM Policy (or its predecessor and/or successor policy/policies) without first being afforded a live hearing and opportunity for cross examination of witnesses.

207.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

208.    The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, and thus there is no question as to ascertainability under the current class definition.

209.    This action satisfies the requirements of Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

210.    Specifically, Defendants have imposed discipline on each member of the Class pursuant to a finding of responsibility under the RVSM Policy without affording them a live hearing or the opportunity for cross-examination of witnesses.  As a result, the class members each (and as a whole) seek declaratory relief stating that MSU's process was unconstitutional and corollary injunctive relief in the form of an order vacating/expunging the decisions/sanctions resulting from the constitutionally defective disciplinary process.

211.    This action also satisfies the numerosity, commonality, adequacy, and typicality requirements of Rule 23(a).

**A.  Numerosity.**

212.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, on information and belief, the number is great enough such that joinder is impracticable, and is estimated to exceed fifty (50) people.

213.    As an indicator of the number of people in the putative class, Plaintiff's counsel has reviewed the most recent copy of Defendant's 2018 Security and Fire Safety Report ("2018 Clery Report").

214.    MSU issued the 2018 Clery Report pursuant to its obligations under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act").  The Clery Act requires colleges and universities participating in federal financial aid programs to maintain and disclose crime and security information.

215.    Certain categories of incidents reported in the 2018 Clery Report represent acts that would fall within MSU's RVSM Policy, including: "Rape," "Fondling," "Domestic Violence," "Dating Violence," and "Stalking."

216.    MSU's 2018 Clery Report provides the following statistics for on-campus incidents that would fall within the RVSM Policy:

> a.   For the year 2015: 15 Rapes; 5 Fondlings; 7 acts of Domestic Violence; 21 acts of Dating Violence; 20 Stalking incidents.  Total number of potential violations resulting in sanctions under the RVSM Policy: **68.**
>
> b.    For the year 2016: 17 Rapes; 6 Fondlings; 7 acts of Domestic Violence; 17 acts of Dating Violence; 29 Stalking incidents. Total number of potential violations resulting in sanctions under the RVSM Policy: **76.**

c. For the year 2017:[3] 15 Rapes; 11 Fondlings; 4 acts of Domestic Violence; 24 acts of Dating Violence; 32 Stalking incidents.  Total number of potential violations resulting in sanctions under the RVSM Policy: **86**.

217. The 2018 Clery Report further states that "Since implementation of its mandatory reporting policy in 2015, the University has seen an astounding year to-year increase in reported complaints under its RVSM Policy."  *See* 2018 Clery Report, at Introduction.

218. As such, while Defendants are uniquely in possession of the information that can quantify the putative Class size with precision, Plaintiffs have a good faith basis to believe such Class is well within the size often cited by courts for establishing numerosity. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1076 (6th Cir. 1996) ("The United States Court of Appeals for the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement."); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (numerosity sufficiently established with 69 members).

219. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

**B. Commonality.**

220. There are fundamental questions of law and fact common to Plaintiff and the Class Members.

221. Plaintiff and the Class Members were each subjected to a disciplinary sanction, suspension or expulsion pursuant to a finding of responsibility under the RVSM Policy without being afforded a live hearing or the opportunity to cross examine their accuser(s).

---

[3] Excluding reported incidents relating to former MSU employee Larry Nassar.

222.   The factual basis for Defendants' improper conduct—denial of the Class Members' right to a live hearing and to cross examine their accusers—derives from MSU's policies, procedures, training and/or standard practices, and is common to all Class Members. Those policies, procedures and practices all emanate from a common history, set of documents, series of university decisions and involve the exact same witnesses.

223.   Likewise, the legal basis for Counts I and V of Plaintiff's complaint is the same for all Class Members – the Fourteenth Amendment (Due Process) and the Michigan State Constitution.  *See Doe v. Baum,* 903 F.3d 575, 578 (6th Cir. 2018) (due process requires opportunity for live hearing and cross-examination).  All burdens of proof, motions and defenses grounded in the constitutional law provisions will be exactly the same for al class members.

224.   Defendants' improper conduct caused a common injury to Plaintiff and the Class Members: improper discipline pursuant to a faulty finding of responsibility under the RVSM Policy.  This improper discipline violated Plaintiff and the Class Members' constitutionally protected property and liberty interests in a common manner.

225.   If the Court finds that Defendants did commit the constitutional violations here alleged, Plaintiff and the Class Members would be entitled to the same declaratory and/or injunctive relief, i.e., vacating/expunging their disciplinary records and reversing/vacating the sanctions.  Likewise, if it is determined that Defendants have fully afforded class members their constitutional rights, Defendants benefit from that determination being made in one proceeding as opposed to facing serial litigation.

### C. Typicality.

226.   There is nothing atypical about Plaintiff or his claim that would render him an inadequate class representative to advance the class claims.  In fact, just like all Class Members,

Plaintiff was subjected to University disciplinary action without first being afforded his constitutional right to a live hearing and to cross examine the accuser and/or adverse witnesses.

227.    To the extent Plaintiff has filed added counts or additional individualized claims in the same Complaint, the existence of such claims does not bar him from serving as class representative as to Count I and Count V.  *See Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976) ("To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law."); Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

### D.  Adequate Representation.

228.    Plaintiff will fairly and adequately protect the interests of Class Members and there is no apparent conflict of interest between Plaintiff and absent class members.

229.    Plaintiff has retained attorneys experienced in the prosecution of constitutional civil rights and university discipline cases, as well as class actions, and Plaintiff intends to prosecute this action vigorously.

### COUNT I
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)
### (Against the Individual Defendants)

230.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

231.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

232.    In this case, Defendants are state actors subject to the Fourteenth Amendment.

233.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

234.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

235.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

236.    Plaintiff's constitutionally protected property interest in his continued enrollment at Michigan State and his right to complete his undergraduate degree at Michigan State was violated by Defendants' actions.

237.    Plaintiff had a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the Michigan State campus.

238.    Plaintiff's constitutionally protected property interest in his right to continued enrollment at Michigan State also arises from the policies, courses of conduct, practices, and understandings established by Michigan State.

239.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Michigan State and Plaintiff.

240.    It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

42

241.    A person who has been admitted to a public university has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

242.    As a result, if Plaintiff as a Michigan State student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Michigan State used.

243.    Michigan State, as a land grant university established by the State of Michigan, and the individual Defendants, as agents of Michigan State, have a duty to provide Michigan State's students equal protection and due process of law by and through any and all policies and procedures set forth by Michigan State.

244.    Plaintiff obeyed all institutional rules when he was wrongly suspended and thus barred from campus by Michigan State.

245.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in completing his undergraduate education at Michigan State at the time he was disciplined by Michigan State and in the future.

246.    Plaintiff was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

247.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

248.     In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness in numerous respects, including, without limitation the following.

249.     Michigan State employs the so-called "single investigator model" for adjudicating sexual assault (and other Title IX) claims.

250.     Under the single-investigator model, as one federal district judge has described the process, a single individual "is given complete authority to decide whether the accused [is] 'responsible' for the alleged violations," acting "simultaneously [as] the investigator, the prosecutor, and the judge who determine[s] guilt." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 579 (D. Mass. 2016).

251.     The single-investigator model contrasts with procedures at other colleges and universities where the accused is afforded a live hearing before a hearing panel, with an opportunity to confront the evidence against him and to cross-examine his accuser.

252.     The single-investigator model has been criticized by judges and commentators because: it is an inquisitorial, as opposed to adversarial, process; it offers no checks or balances against investigator bias, including unconscious racial or sexual bias; it allows a single individual to act as prosecutor, investigator, judge, and jury determining guilt; and, crucially, it allows the investigator to find the accused guilty without ever affording him a hearing where evidence can be confronted, witnesses questioned, and the accuser cross-examined.

253.     Recently, a District Court in this Circuit issued a preliminary injunction against the continued use of a single-investigator procedure in a sexual assault case at the University of Michigan, where a similar policy was in effect, stating that "this Policy deprives Plaintiff of a live

hearing and the opportunity to face his accuser. Because of the University's method of private questioning through the investigator, Doe has no way of knowing which questions are actually being asked of Roe or her response to those questions. Without a live proceeding, the risk of an erroneous deprivation of Doe's interest in his reputation, education, and employment is significant." *Doe v. Univ. of Mich.*, 2018 U.S. Dist. Lexis 112438 (E.D. Mich. July 6, 2018).

254.     Following Michigan State's single-investigator procedure, Defendants subjected Doe to an inquisitorial, rather than adversarial, adjudicatory process, in which Defendants Mark Ehlers and Kendra Waldsmith served simultaneously as prosecutor, investigator, judge and jury adjudicating guilt, with no checks or balances on sexual bias.

255.     Following the university's single-investigator procedure, Defendants denied Plaintiff any opportunity for a live hearing.

256.     Following the university's single-investigator procedure, Defendants denied Doe any opportunity to confront evidence, to face his accuser, to cross-examine his accuser, and to confront any other witnesses.

257.     Over ten years ago, the Sixth Circuit explicitly stated that in university disciplinary proceedings, in cases involving a "*choice between believing an accuser and an accused*," "*cross-examination* is not only beneficial*, but essential to due process*." *Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (emphasis added).

258.     On September 7, 2018, in *Doe v. Baum*, the Sixth Circuit explicitly reaffirmed the holding in *Flaim*. *Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *1 (6th Cir. Sept. 7, 2018) ("Today, we reiterate that holding once again: if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent

an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder.")

259.    Since there were no eyewitnesses and no conclusive documentary or physical evidence, Roe's allegations against Doe came down entirely to a credibility assessment – a "choice between believing an accuser and an accused."

260.    Accordingly, by declaring Doe guilty of sexual assault without ever affording him any opportunity to cross-examine Roe, Defendants violated Doe's clearly established constitutional rights.

261.    Moreover, Michigan State improperly employs a disciplinary process that fails to utilize mechanisms designed to ensure the parties involved receive fair and appropriate due process:

      a.  There is no sworn testimony;

      b.  There is no cross-examination; and

      c.  There is no proper hearing in which testimony was taken.

262.    Defendants' conduct in failing to give Doe notice or ensure that he received proper notice stemmed from a presumption that Roe's accusations were true simply because she was the female complainant.

263.    The process afforded by Michigan State results in Defendants having unfettered discretion to engage in discriminatory decision-making in favor of a female first year student at the expense of a male sophomore student.

264.    Michigan State's procedures were defective and violated due process because they do not allow for the taking of testimony and cross-examination of witnesses.

265.    Defendants were pressured by the Obama Administration's DOE into following the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter regardless of what otherwise would be proper due process considerations.

266.    Michigan State was the subject of two OCR investigations that were resolved in 2015.  The OCR concluded that Michigan State failed to investigate two sexual assault complaints in a timely manner and that policy deficiencies may have contributed to a hostile environment for some students and employees in the past.

267.    During the Winter and Spring of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.   The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018. https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).  Those investigations are still pending.

268.    Lhamon, as quoted above, made numerous public statements about the obligation of colleges and universities to conform to the Dear Colleague Letter or face the cut-off of federal funding.  The DOE and OCR have accordingly treated the Dear Colleague Letter as binding on regulated parties for all practical purposes.

269.    The Dear Colleague Letter has in fact resulted in significant action and legal consequences.  At the July 2014 Dartmouth College conference, Ms. Lhamon stated: "Our release of the [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the [Dear Colleague Letter]."

270.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: (i) his right to a fair adjudication,

free of bias; (ii) his right to be innocent until shown to be responsible; (iii) his right to be heard by an impartial factfinder; (iv) his right to question his accuser and challenge the credibility of other adverse witnesses; and (iv) his right to present evidence and witnesses in support of his defense. These rights are well established by Sixth Circuit precedent.

271.    In    attempting    to    demonstrate    their    compliance    with    the Dear Colleague Letter, the Defendants subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself; and arrived at a predetermined, arbitrary, and unwarranted decision tainted by gender bias.

272.    As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

273.    Defendants, as well as other agents, representatives, and employees of Michigan State, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

274.    Defendants all agreed to, approved, and ratified this unconstitutional conduct as described above.

275.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation, loss of employment and educational opportunities, and other economic and non-economic damages.

276.    In particular, the discipline imposed by Michigan State has permanently damaged Plaintiff's his career prospects in his chosen profession, denied him the benefits of education at his chosen school and damaged Plaintiff's reputation.

277.    Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

278.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress; loss of educational and career opportunities; economic injuries; and other direct and consequential damages. Plaintiff's interests in the results of the disciplinary process are significant.

279.    Defendants' conduct as described herein was malicious, reckless, and/or callously indifferent to Plaintiff's rights such that Plaintiff is entitled to an award of punitive damages.

280.    As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

281.    Plaintiff, as class representative, seeks declaratory and injunctive relief declaring MSU's disciplinary process under the RSVM unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring Michigan State to destroy all disciplinary records concerning Plaintiff.

**COUNT II**
**(Violation of Title IX of the Education Amendments of 1972)**
**(Against Michigan State)**

282.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

283.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

>    No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

284.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

285.    According to Michigan State's 2017- 2018 Budget, it received over $18 million in federal funds.

286.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

287.    The Obama Administration's promulgated regulations under Title IX require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student … complaints alleging any action which would be prohibited by" Title IX or regulations thereunder.   Such prohibited actions include all forms of sexual misconduct.   34 C.F.R. § 106.8(b).

288.    Even the Obama Administration ostensibly recognized that the procedures adopted by a school such as Michigan State covered by Title IX must accord due process to both parties involved.

289.     Moreover, there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

290.     The Sixth Circuit has expressly recognized several different "theories of liability that a student who is 'attacking a university disciplinary proceeding on grounds of gender bias' can potentially assert under Title IX." *Doe v. Miami Univ.,* 882 F.3d 579, 589 (6th Cir. 2018) (citation omitted).

291.     Three of these recognized theories of liability are "(1) 'erroneous outcome,' (2) 'selective enforcement,' [and] (3) 'deliberate indifference.'" *Id.*

292.     To plead an erroneous-outcome claim under Title IX, a Plaintiff found guilty of sexual assault by a university must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* at 592 (citations omitted).

293.     Here, Defendants' finding that Plaintiff was guilty of non-consensual sexual intercourse with Roe was utterly erroneous. Facts casting much more than "articulable doubt" on its accuracy have been recounted in detail above, but such facts include, without limitation:

> a. The fact that there were no eyewitnesses to the alleged sexual assault. The outcome of the investigation therefore depended on the outcome of a credibility contest between Roe and Doe.
>
> b. The fact that there was no live hearing and no cross-examination of the accuser, which alone, as the United States District Court for the Eastern District of Michigan recently stated, creates a "significant" risk of an

"erroneous" outcome. *Doe v. Univ. of Mich.,* 2018 U.S. Dist. Lexis 112438 (E.D. Mich. July 6, 2018) ("Without a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant.").

c.   The fact that Roe had significant implausibility and inconsistencies within the narrative of the alleged assault that she recounted to investigators. Her allegation that Doe moved her underwear to the side twice before penetration is inconsistent with her claim that Doe had both arms wrapped tightly around her during the alleged assault.  For Roe's claim to be credible, Doe would have to have at least three arms, a physical impossibility.  He would have to have two arms with which to restrict her ability to move and another to move her underwear to the side.

d.   The fact that the details of the alleged sexual account that Roe told investigators were inconsistent with the details of the account that she shared with witness A.R.  Even though Roe told the investigators that Doe had both of his arms wrapped around her, so tightly that she was "'smashed'" into him, and so tightly that he could not to remove her underwear, when he initially attempted to do so, in the narrative that she shared with Witness A.R., Roe omitted any mention of being "'smashed'" into Roe.   In the version of events told to A.R., Roe's hand was free to be placed over her genitals.

e.   The fact that Roe provided yet another version of the alleged assault in her revisions to the draft investigative report.  This time she claimed that Doe

"held [her] tight on top of him and physically moved [her] underwear to the side and put his hand on his penis and inserted into [her].  In addition to being inconsistent with Roe's initial account to OIE investigators and with her rendition of events to her friend, this version is another physical impossibility, requiring Doe to have four hands.

    f.   The fact that Defendant Ehlers' March 14, 2018 correspondence, notifying Doe of the investigation provided Doe of vague and inadequate notice of the charges and allegations against him.  Having met with Roe on February 28, 2018, OIE knew that she was specifically accusing Doe of non-consensual penetration.  However, the notice letter did not particularize that allegation and did not state the specific offense under the RVSM that was being investigated. The vague and inadequate notice prejudiced Doe's ability to prepare his defense.

294.    There was a particularized causal connection between the erroneous outcome in this case and gender bias.  Facts sufficient to plead the existence of this bias and its **connection** to the erroneous outcome have already been alleged above in detail and include, without limitation, the following:

    a.   The investigators' credibility determination—which their finding entirely depended on—was based wholly on gender bias.  The investigators chose simply to credit Roe's story and reject Plaintiff's statements even though there was no evidentiary basis for doing so.

    b.   The investigators' further demonstrated gender bias in the disparate and unlawful weight they gave to Roe's witnesses on the one hand as opposed to

53

witnesses corroborating Plaintiff's statements on the other. Despite inconsistencies between the narrative that Roe told investigators and narrative of the event that Roe texted to Witness A.R., the investigators nonetheless concluded in their findings and analysis that Roe's witnesses "independently corroborated Claimant's [Roe's] account of what happened."

c. The investigator failed to adequately investigate discrepancies between narratives of Roe and Doe. Such discrepancies include but are not limited to a disagreement on the number of times that penetration occurred.

d. The investigator failed to thoroughly investigate the significant implausibility and inconsistencies within the narrative of the alleged assault that Roe recounted to investigators. Her allegation that Doe moved her underwear to the side twice before penetration is inconsistent with her claim that Doe had both arms wrapped tightly around her during the alleged assault. For Roe's claim to be credible, Doe would have to have at least three arms, a physical impossibility. He would have to have two arms with which to restrict her ability to move and another to move her underwear to the side. Roe provided yet another version of the alleged assault in her revisions to the draft investigative report. This time she claimed that Doe "held [her] tight on top of him and physically moved [her] underwear to the side and put his hand on his penis and inserted into [her]. In addition to being inconsistent with Roe's initial account to OIE investigators and with her rendition of events to her friend, this version is another physical impossibility, requiring Doe to have four hands.

54

e. The investigators likewise failed to conduct thorough independent credibility analyses of Roe's witnesses. The investigators did not explicitly analyze whether any of Roe's witnesses had a motive to lie on Roe's behalf.

f. Without a rational basis for doing so, the investigators gave greater weight to Roe's actions following the alleged assault than they did to Plaintiff's actions. For example, the investigators put great weight into the fact that Roe had a rape kit taken. The investigators did not give as great weight to the fact that following the alleged assault, Plaintiff remained consistently confused as to the allegations against him because these allegations did not comport with the reality of the events that transpired. Plaintiff's contemporaneous statements to his witness reflect a consistent narrative of the events in question.

g. The investigators failed to thoroughly investigate discrepancies in the accounts of Roe's behavior following the alleged assault and failed to properly consider these discrepancies in conducting a credibility analysis of Roe. Notably, the investigators chose not to interview five witnesses submitted by Doe who observed Roe attending a St. Patrick's Day party held by the fraternity just a few weeks after the alleged assault.

h. The investigators omitted relevant facts from the investigative report. Doe told the investigators that he did have a condom in the drawer beneath his loft bed. Had he intended to have intercourse, he could have easily reached for the condom. The fact that Doe did not get the condom indicated that he did not intend to have sexual intercourse with Roe. On information and belief,

the investigators began with a presumption that Doe was guilty and only

included statements in investigative report that would support that finding.

i.   The investigation was tainted by investigator bias. Defendant Ehlers has a

background as a sex crimes prosecutor.   On information and belief, he

approached the investigation from a prosecutorial stance, rather than that of a

neutral fact-finder, seeking to build a case against Doe.

j.   Defendant Ehlers' March 14, 2018 correspondence, notifying Doe of the

investigations, provided Doe of vague and inadequate notice of the charges

and allegations against him.   Having met with Roe on February 28, 2018,

OIE knew that she was specifically accusing Doe of non-consensual

penetration.   However, the notice letter did not particularize that allegation

and did not state the specific offense under the RVSM that was being

investigated. The vague and inadequate notice was motivated by gender bias

and the climate surrounded sexual assault at Michigan State.

295.   This disparate treatment of Roe and Doe in the investigation was a result of
gender bias and a clear act of sex discrimination, leading directly to Michigan State's false
conclusion that Plaintiff was guilty of sexual assault.

296.   In addition, Defendants' erroneous outcome in Plaintiff's case was a direct result
of a gender-biased campaign to credit female students' claims of sexual assault launched by
Michigan State.

297.   As detailed above, around 2014 the University came under intense pressure from
several different sources to vigorously prosecute female students' claims of sexual assault and to
punish alleged male sexual assailants.

56

298.     On September 1, 2015, OCR issued a letter to Michigan State finding a "sexually hostile environment" at the University.  OCR threatened Michigan State with a cut-off of federal funding—a potential loss of millions of dollars—due to claims that the University had failed to vigorously prosecute, convict and punish alleged male sexual assailants.

299.     Later that month, a report was published, attracting considerable media attention, alleging extraordinarily high levels of unredressed sexual assaults against female undergraduates at Michigan State.

300.     The already-heated campus climate concerning sexual assault reached its boiling point in Spring, 2018, when Doe was being investigated for rape.

301.     As previously discussed, during the Winter and Spring of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018.  https://projects.propublica.org/graphics/civil-rights-violations#840  (last accessed on September 24, 2018).

302.     Likewise, in the Spring of 2018, the University garnered a great deal of bad publicity concerning the sexual assaults committed by its former employee Dr. Larry Nassar.  The New York Times reported: "the university has acknowledged some wrongdoing: It agreed to a $500 million settlement with 332 women and girls who were abused by Dr. Nassar, who for about 20 years abused athletes in his care."   https://www.nytimes.com/2018/05/30/sports/lou-anna-simon.html

303.     Determined to placate OCR, to avoid the potential loss of millions of dollars in federal funding, to restore its reputation, and to protect itself from future liability, Defendants in or shortly after September 2015 launched a campaign to—in its own words—go "above and

beyond" even OCR's demands, and to "drive cultural change," prosecuting female students'

sexual assault claims aggressively, proving its willingness to believe female students who claimed

sexual assault, and convicting and punishing alleged assailants.

304.     Thus, when it found Plaintiff guilty of sexual assault, Defendant Michigan State

violated Title IX under the "erroneous outcome" theory of liability.  Plaintiff was wrongly found

responsible and the finding of responsibility was motivated by gender bias.

305.     In the Sixth Circuit, to sufficiently plead a Title IX violation under the "deliberate

indifference" and "selective enforcement" theories of liability, a male student found guilty of

sexual assault by a university may allege that responsible university officials had knowledge that

the male student had a claim that he in fact was sexually assaulted by the female complainant, but

that such officials only investigated prosecuted her claim against him, while not prosecuting or

investigating his claim against her. *Doe v. Miami Univ.,* 882 F.3d 579, 591 (6th Cir. 2018)

(deliberate indifference); *but see **Doe v. Baum**,* No. 17-2213, 2018 WL 4265634, at *9 (6th Cir.

Sept. 7, 2018) (to plead a Title IX deliberate-indifference claim, the misconduct alleged must be

sexual harassment, not just a biased disciplinary process); *Gischel v. Univ. of Cincinnati,* No.

1:17-cv-475 (S.D. Ohio, July 6, 2018) (selective enforcement).  It is not necessary, in such cases,

that the male student file a formal charge.  *Id.*

306.     Michigan State violated Title IX through deliberate indifference to gender bias

and through gender-biased selective enforcement in Plaintiff's case:

>      a.   While it is undisputed that Roe was sober during the alleged assault, Doe had
>           been drinking alcohol during the "Beer Olympics" event at his fraternity and
>           subsequently consumed "whiskey and coke."  In addition to the simulated
>           sexual intercourse and instances of slight vaginal penetration at issue, by her

own admission, Roe engaged in oral sex with Doe and digitally manipulated his genitals.   Michigan State did not investigate whether Doe was incapacitated under the Policy and did not investigate whether Roe had violated the RVSM Policy regarding consensual sexual activity vis a vis Doe on the night of February 23-24, 2018.

b.  In his interview with investigators, Doe stated that Roe removed his underwear and began to perform oral sex on him.  Doe had not asked Roe to perform oral sex, nor did Roe verbally ask Doe for consent to perform oral sex.  Doe did not tell Roe to stop and simply "went with it."  Michigan State did not investigate whether Roe had violated the RVSM Policy regarding consensual sexual activity vis a vis Doe on the night of February 23-24, 2018.

c.  The severity of Doe's sanction was unduly harsh and motivated by gender bias against him as the male accused.  Doe noted in his mitigation statement, that the following factors warranted a lenient sanction: 1) he had no prior record of misconduct; 2) that there was no risk of recurrence, no ongoing threat, and that he was severely impacted by the (false) allegations; and 3) that the investigators found that he had not "acted with malicious intent" and may have acted in the "passion of the moment."  Notably, the University had not issued an interim no-contact order in this matter.  Nonetheless, in the face of two pending OCR investigations in the Spring of 2018, and in the midst of the bad publicity surrounding Larry Nassar, a former Michigan State employee who sexually assaulted numerous women, the University sought to

59

appease Roe and simply rubberstamped the sanction that Roe requested in

her victim impact statement.  *See Yusuf v. Vassar College*, 35 F.3d 709, 715

(2d Cir. 1994) (selective enforcement claim asserts "that, regardless of the

student's guilt or innocence, the severity of the penalty and/or the decision to

initiate the proceeding was affected by the student's gender.")

307.    Accordingly, Michigan State violated Title IX through deliberate indifference to

gender bias and through gender-biased selective enforcement in Plaintiff's case.

308.    As a result of the foregoing, Plaintiff is entitled to a judgment against Michigan

State awarding Plaintiff damages in an amount to be determined at trial, including, without

limitation, damages to physical well-being, emotional and psychological damages, damages to

reputation, past and future economic losses, loss of educational opportunities, and loss of future

career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

and an injunction against and to an injunction enjoining violations of the Title IX in the process of

investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records,

requiring Michigan State to destroy all disciplinary records concerning Plaintiff; and reinstating

Plaintiff to the University for future studies.

**COUNT III**
**Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States**
**Constitution)**
**(Against all Defendants)**

309.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

310.    The Fourteenth Amendment to the United States Constitution provides in

pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

311.    The allegations of gender discrimination made in Count II above and elsewhere in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

312.    As a result of the foregoing, Plaintiff is entitled to a judgment against Michigan State awarding Plaintiff an injunction against further violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, including Plaintiff's, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual defendants in their personal capacities, damages, including punitive damages, in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT IV
### (State Law Estoppel and Reliance)
### (Against Michigan State)

313.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

314.    Michigan State's various policies constitute representations and promises that Michigan State should have reasonably expected to induce action or forbearance by Plaintiff.

315.    Michigan State expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that it would not tolerate, and Plaintiff would not suffer harassment by fellow students; and it would not deny Plaintiff his procedural rights should he be accused of a violation of Michigan State's Policies.

316.    Plaintiff relied to his detriment on these express and implied promises and representations made by Michigan State.

317.    Based on the foregoing, Michigan State is liable to Plaintiff based on estoppel.

318.    Plaintiff is entitled to recover damages for Michigan State's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

<u>**COUNT V**</u>
<u>**Violation of Plaintiff's Due Process Rights Article 1, § 17 of Michigan's Constitution – Due Process, Fair and Just Treatment in the Course of Legislative and Executive Investigations and Hearings**</u>
<u>**(Against All Defendants)**</u>

319.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

320.    Plaintiff has the right under the Michigan Constitution, among others, to not be deprived of life, liberty, or property without due process of law, and to fair and just treatment in the course of an investigation and/or hearing.

321.    Defendants, by virtue of custom and policy and under color of law, have violated Plaintiff's rights conferred by the Michigan Constitution by, among other things –

    a.   denying him due process, as described in detail in Count I, supra;

    b.   denying him fair and just treatment in the course of an investigation;

        i.   Seeking to placate and eliminate Roe's complaint rather than conducting a fair and impartial investigation;

        ii.   Failing to conduct a hearing in which testimony was taken at any point in the process;

        iii.   Ignoring the inconsistencies in Roe's narrative in a manner designed to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

        iv.   Failing to provide Plaintiff the opportunity to be heard in front of a fair and impartial tribunal;

        v.   Failing to provide Plaintiff the opportunity to confront and cross-examine Roe and any adverse witnesses at a fair hearing;

        vi.   Arbitrarily and capriciously suspending Plaintiff from Michigan State.

322.    The foregoing acts were intentional, unlawful, unprivileged, and without protection of any immunity.

323.    As a direct and proximate cause of Defendants' actions in violation of Plaintiff's constitutional rights, Plaintiff suffered and continues to suffer tremendous damages, including, without limitation, emotional distress; loss of educational and other career opportunities; economic injuries and other direct and consequential damages.

324.    Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

325.    As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

326.    Plaintiff, as class representative, seeks declaratory and injunctive relief declaring MSU's disciplinary process under the RSVM unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring Michigan State to destroy all disciplinary records concerning Plaintiff.

## COUNT VI
## Intentional Infliction of Emotional Distress
## (Against All Defendants)

327.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

328.    Defendants' conduct as more fully outlined above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses was intentional.

329.    Defendants' conduct as more fully outlined above including but not limited to including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses,

was extreme, outrageous, and of such character as not to be tolerated by a civilized society, *i.e.,* where the accused is provided no meaningful opportunity to defend himself against false allegations.

330.    Defendants' conduct as more fully outlined above was for an ulterior motive or purpose, *i.e.,* in an effort to appease Roe, avoid further scrutiny from OCR concerning Michigan State's handling of sexual misconduct matters, and to avoid further bad publicity in the wake of the Larry Nassar scandal, a former Michigan State employee who committed numerous sexual assaults.

331.    Defendants' conduct resulted in severe and serious emotional distress.

332.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness and depression; and other damages that may arise during the course of discovery and the course of trial in this matter.

333.    Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

**COUNT VII**
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

334.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

335.    Defendants' conduct as more fully outlined above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was, at the very least, negligent.

336.   Defendants' negligence proximately caused the harm to Plaintiff's reputation and educational career.

337.   The Defendants' actions as more fully outlined above would naturally and probably result in emotional distress to Plaintiff.

338.   The Defendants' actions did, in fact, cause severe emotional distress to Plaintiff.

339.   The emotional distress suffered by Plaintiff physically manifested itself in symptoms including, but not limited to: sleeplessness; depression; and such other injuries and physical manifestations as may appear during discovery in this matter.

## PRAYER FOR RELIEF

**WHEREFORE,**  for  the  foregoing  reasons,  Plaintiff  demands  judgment  against

Defendants as follows:

(i)        on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against the individual defendants awarding Plaintiff and the Class damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; class certification under Fed. R. Civ. P 23(b)(2) and naming himself and his counsel as Class Representative and Class Counsel; declaratory and injunctive relief declaring MSU's disciplinary process under the RSVM unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring Michigan State to destroy all disciplinary records concerning Plaintiff;

(ii)       on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Michigan State awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational  opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the University for future studies;

(iii)      on the third cause of action for violation of the  Equal Protection Cause of  the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983, a judgment against all Defendants awarding Plaintiff an injunction against violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual Defendants, damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive

damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for violation of the Michigan Constitution, a judgment awarding Plaintiff and the Class, damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; class certification under Fed. R. Civ. P 23(b)(2) and naming himself and his counsel as Class Representative and Class Counsel; declaratory and injunctive relief declaring MSU's disciplinary process under the RSVM unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring Michigan State to destroy all disciplinary records concerning Plaintiff;

(vi)    on the sixth cause of action for Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action for Negligent Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and the cost for treatment of same;

(viii)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated:  July 5, 2019
      New York, NY            Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

By: *<u>/s/Andrew T. Miltenberg</u>*
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Cindy Singh, Esq.
Attorneys for Plaintiff
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
csingh@mllplaw.com

**BOGAS & KONCIUS, P.C.**
Brian E. Koncius, Esq. (P69278)
Local Counsel for Plaintiff
31700 Telegraph Road, Suite 160
Bingham Farms, MI 48025
248-502-5000 (telephone)
248-502-5001 (fax)
bkoncius@kbogaslaw.com

**SOMMERS SCHWARTZ, P.C.**
Jason J. Thompson (P47184)
Kevin J. Stoops (P64371)
One Towne Square, Suite 1700
Southfield, Michigan 48076
248-355-0300
jthompson@sommerspc.com
kstoops@sommerspc.com

***Attorneys for Plaintiff John Doe***
***and putative class counsel***